**B. C. VANDERHORST**, et al., Interveners, v. **W. V. KNOTT**, as Treasurer of the State of Florida and Ex Officio Insurance Commissioner.

31 So. (2nd) 857

July 29, 1947

Rehearing denied September 30, 1947

June Term, 1947

Special Division A

*George E. Turner* and *Lucien H. Boggs,* for appellants.

*Jennings, Watts, Clarke & Hamilton,* for Peoples Industrial Insurance Company, *J. Leonard Lewis,* for Afro-American Life Insurance Company, *J. Tom Watson,* Attorney General, *Fred M. Burns* and *Howard S. Bailey,* Assistant Attorneys General, for the Insurance Commissioner, appellees.

CHAPMAN, J.:

Prior to the year 1934, the Peoples Industrial Insurance Company, a Florida corporation, with its main office in Jacksonville, Florida, was in precarious financial circumstances. The State Treasurer (then Honorable W. V, Knott), and ex officio Insurance Commissioner of Florida, by an appropriate order authorized by the several provisions of Section 625.03, Fla. Stats. 1941 (FSA), during the month of September, 1934, reduced the value of the stock from $100.00 to $50.00 per share, the effect of which was to reduce the capital stock account of the corporation from $75,000.00 to $37,500.00. This order likewise created or established on the books of the corporation a surplus of about $4,000.00. The State Treasurer issued to it a temporary or probationary permit. The stock in the corporation was owned by some thirty stockholders, most of whom resided in Duval County, Florida. The record reflects discord or the lack of harmony among the stockholders of the corporation.

A statement issued on December 31, 1934, by the Peoples Industrial Insurance Company placed its liabilities in the total sum of $59,877.56. The assets of the company as disclosed by the statement were valued at $128,509.10. One of the controversial issues in this suit is the value of the several items listed as assets. For examples, bonds were carried among its assets at a value of $11,000.00: two of the City of Lakeland; five of St. Johns County and four of Duval County. The Chancellor, on the report of the Master, fixed the value of these bonds at the sum of $4,300.00. Furniture and fixtures appeared on the statement at a value of $11,264.27 — the Master fixed the value thereof at the sum of $1,000.00. Real estate appeared on the statement at a value of $88,442.32. The value of the real estate was by the Master fixed at the sum of $37,000.00 The record discloses that the officers of the company, in the early part of 1935, were negotiating with similar companies with a view of selling, with the approval of the Insurance Commissioner, the assets of the Peoples Insurance Company.

The record discloses that a Committee of the Peoples Industrial Insurance Company (hereinafter referred to as the

"Peoples"), authorized so to do by its officers, attempted to negotiate a sale of its assets with four insurance companies: (1) Allstate Insurance Company of Montgomery, Alabama; (2) Central Life Insurance Company of Tampa, Florida; (3) Guaranty Life Insurance Company of Jacksonville, and (4) Afro-American Life Insurance Company of Jacksonville, Florida. In early January, 1935, a sale and purchase agreement of the assets of the Peoples was reached between the officials of the Peoples and Afro-American Life Insurance Company and a tentative agreement was entered into, subject to the consent and approval of the Insurance Commissioner of Florida. The agreement with modifications was subsequently approved by the Insurance Commissioner, with the condition that it should not become effective until ratified and approved by the Board of Directors and stockholders of the Peoples. Mr. McCann, an agent of the Insurance Commissioner, was sent to Jacksonville pursuant to a request of the Secretary of the Peoples when meetings were held with the directors and officials of the Peoples and its financial difficulties were considered and discussed.

On January 24, 1935, Honorable W. V. Knott, as State Treasurer and Ex Officio Insurance Commissioner, pursuant to Section 626.12, Fla. Stats. 1941 (FSA), through the then Attorney General of Florida, presented to the Circuit Court of Duval County, Florida, a petition praying for a court order for leave and authority to take possession of and operate the Peoples for the purpose of protecting the creditors, policy holders, stockholders and the public interest generally of the Peoples because of its insolvency. An answer signed by the Peoples, through its Secretary, was simultaneously presented, which admitted each and every the allegations of the petition, when an order was entered directing the Insurance Commissioner of Florida to take possession of the property of the company and operate its business.

On February 20, 1935, the Insurance Commissioner filed liquidation proceedings against the Peoples in the Circuit Court of Duval County, Florida, under Section 626.16, Fla. Stats. 1941 (FSA). An answer consenting thereto was filed by the Peoples, signed by G. E. Curry, its president, and S. A.

Austin, its secretary. An order dated Febraury 20, 1935, was entered by the Circuit Court directing the liquidation of the business of the company. On February 20, 1935, a petition for leave to execute an agreement for the sale of certain assets of the Peoples was presented to the Circuit Court and an appropriate order granting leave and authority to execute the agreement of sale of the assets thereof to the Afro-American Life Insurance Company. The same court, on March 13, 1935, entered an order authorizing the Insurance Commissioner to execute an agreement to dispose of the remainder of the assets of the Peoples to Afro-American Life Insurance Company. It appears that the agreements were executed pursuant to the authority granted in its orders.

On March 11, 1935, an order was entered by the Circuit Court directing that all creditors of the Peoples Industrial Insurance Company file their claims on or before May 15, 1935, with the Insurance Commissioner, and that this notice to creditors be published in a newspaper once each week for four consecutive weeks. The case remained inactive after May 15, 1935, until June 2, 1939, when the final report of liquidation was presented to the court, and at a hearing had thereon on July 17, 1939, the claims were ordered paid. The stockholders claims were reported to the court by the Insurance Commissioner and after notice of hearing the report was modified and approved and ordered paid by the Court. Report of distribution of all funds of Peoples was presented to the Court, along with a petition for a discharge by the Insurance Commissioner, but this order as applied for was not entered by the lower Court. It appears from the record that the total sum of $1,362.89 was distributed by the Liquidator under the Court's order to the stockholders and creditors of the Peoples Industrial Insurance Company.

On August 15, 1940, B. C. Vanderhorst and C. E. Curry, and others, for themselves and all others in like position, as stockholders of the Peoples Industrial Insurance Company, filed in the liquidator proceedings in the Circuit Court of Duval County, Florida, a bill of complaint identifying themselves therein as intervenors. The bill of complaint in a general manner recited, referred to, or made allegations as to

the said liquidator's proceedings—beginning with the original petition filed on January 24, 1935, and referred to each succeeding petition, order, or step in the cause until July 17, 1939. Paragraph 10 is viz:

"10. That your intervenors would further show unto this Honorable Court that through covin, fraud, collusion, and conspiracy, between S. A. Austin, as Secretary of the People's Industrial Insurance Company, A. L. Lewis, the Afro-American Life Insurance Company, and the Insurance Department of the State of Florida, the assets of the peoples Industrial Insurance Company were transferred to the Afro-American Life Insurance Company for $1751.00 to the detriment of the stockholders of said Peoples Industrial Insurance Company; that by reason of said covin, fraud, collusion, and conspiracy, your intervenors herein, together with the other stockholders of said Peoples Industrial Insurance Company have been defrauded out of approximately $100,000.00."

The bill further alleges that the Afro-American Life Insurance Company began effectually operating the business of the Peoples Industrial Insurance Company at 12:00 o'clock January 14, 1935, without first having obtained the ratification or approval of the sale by the stockholders of the said Peoples Industrial Company; that since the 14th day of January, 1935, the Afro-American Life Insurance Company has operated the business of the Peoples Industrial Insurance Company and has converted to its own use all of the assets of the Peoples Industrial Insurance Company, including the $8,000.00 on deposits with the Insurance Commissioner of Florida; that on January 24, 1935, when this proceeding was instituted, there was no insurance business of the Peoples Industrial Insurance Company for the Insurance Commissioner to take possession of under the original petition.

The bill of complaint prays (1) that an order be entered vacating, setting aside and cancelling all the orders and decrees of the Circuit Court of Duval County which permitted or allowed W. V. Knott, as Insurance Commissioner of Florida, to liquidate, transfer and take possession of the assets of the Peoples Industrial Insurance Company; (2) that an accounting be had for the premiums received from the business, the

real estate, and all assets delivered to the Afro-American Life Insurance Company under the agreements filed with the petitions under date of January 24, 1935, and February 24, 1935, and February 20, 1935; (3) that process issue against the Afro-American Life Insurance Company and that it be required to answer this bill of intervention; (4) that such other relief may be granted as shall be conformable to law and equity.

The answer of Honorable W. V. Knott, Insurance Commissioner, to the bill of intervention denied that the assets of Peoples were transferred to Afro-American Life Insurance Company (hereinafter referred to as Afro-American) through fraud, covin, collusion or conspiracy; and denied the allegation that Peoples was solvent on January 24, 1935, when the Commissioner took possession of the property and operated the business under a court order. The answer alleged that the property and assets of peoples were sold at the very best price obtainable. The answer of the Afro-American to the bill of complaint presents about the same defense or defenses and makes approximately the same issues as are set forth in the answer of the Insurance Commissioner. The cause was referred to Honorable Edward McCarthy, Jr., as Special Master, with directions to take all the evidence offered by the respective parties and in his report to the Chancellor to make findings both as to law and facts, with recommendations as to the decree to be entered in the premises. The Special Master heard the parties and recommended that an order of dismissal be entered by the Chancellor in the cause. Exceptions were filed but the Chancellor overruled the same and entered an order dismissing the bill of intervention. The plaintiffs below appealed.

Counsel for the appellant stockholders contend that at the time of the negotiation for the sale of Peoples, likewise on January 24, 1935, when the Insurance Commissioner of Florida obtained a court order to take possession of and operate the business; also on February 20, 1935, when the court entered the liquidation order, the Peoples Industrial Insurance Company was financially sound and owned and possessed assets of the approximate value of $100,000.00 in excess of its

liabilities. That the transfer of Peoples' assets to the Afro-American Life Insurance Company for a consideration of $1,751.00 to the detriment of Peoples' stockholders was accomplished through fraud, collusion and conspiracy on the part of S. A. Austin, Secretary of Peoples, A. L. Lewis of the Afro-American, and the Insurance Commissioner of Florida (Honorable W. V. Knott, State Treasurer), and as a result of this fraud and conspiracy the stockholders of Peoples have been defrauded out of approximately $100,000.00.

The answer to these contentions must be found in the testimony considered by the court below and certified here. If the contentions supra are established by the testimony, then the several questions posed for adjudication by counsel for' appellants may be examined and decided. if the Peoples was insolvent when the State took it over, then the pertinent question is the probable value of the equity of each share of stock as owned by the stockholders in the insolvent company as reflected by all the testimony.

In considering this question the testimony discloses (1) that the Insurance Commissioner of Florida, in September, 1934, reduced the capital stock account of Peoples from $75,000.00 to $37,500.00 and allowed it to operate *only* on a probationary permit; (2) solvency is established, it is contended, by the receipt of an offer to buy Peoples' assets (a) Jacksonville debits for $20,000.00, and (b) the entire debits of Peoples for $55,000.00, made by Allstate Insurance Company of Montgomery. The Insurance Commissioner declined this offer because the policy holders of Peoples, by the terms of the offer, were required to surrender their policies and accept in lieu thereof policies in the officer's company to be written at their attained age. It was the statutory duty of the Insurance Commissioner to protect the creditors and policy holders of Peoples, and, while the offer as made was favorable to the stockholders, the Insurance Commissioner concluded it was not to the financial interest of the creditors and policy holders. (3) It is true that the Central Life Insurance Company of Tampa offered $45,520.00 for the debits of Peoples over the entire State of Florida. This offer overlooks the debts and obligations owed by Peoples and the offer possibly

was favorable to Peoples' stockholders. (4) The Guaranty Life Insurance Company offered $50,000.00 for the assets of Peoples, but it was not a cash offer but stock in the offerer's corporation. There is some testimony that the Guaranty company at the time the offer was made had not obtained from the Insurance Commissioner a permit to do a life insurance business in Florida. (5) A balance in the sum of $62,919.00 for the stockholders as recited in a letter to Peoples written by the president of Afro-American is relied upon to establish the solvency of Peoples. It is the writer's view that these figures cannot be considered as the true market value of Peoples' assets but simply reflect the book value thereof as placed upon them by the officials of Peoples.

The analysis of the assets of Peoples Industrial Insurance Company as of January, 1935, as made to the Court below by Honorable Edward McCarthy, Jr., Special Master, is not only thorough but exhaustive. Pertinent and material portions thereof are viz:

"The defendant Peoples Industrial Insurance Company owed debts of not less than $53,000.00 in January, 1935, a large part, if not all, of which was past due or payable on demand. There were practically no current assets, there being less than $200.00 cash. Over a period of at least two months, its bank account had been overdrawn from $861.94 to $1859.36. The published financial statements showed among the assets 'petty cash $357.01,' but there was no proof that that amount was actually in the till; and it is to be doubted, because the petty cash balance, significantly enough, remained unchanged at the old figure of $357.01 from at least as early as December 30th, 1933, to January 24th, 1935.

"The financial statements showed 'bonds $11,000.' This represented the face value of two City of Lakeland bonds, five St. Johns County bonds and four Duval County bonds. . . .

"The Duval County bonds ceased to be an asset of the company prior to January 7th, 1935. . . .

"The Lakeland and St. Johns County bonds, par value $7,000.00, so far as there is any evidence of their value, were worth about $4,300.00 (Page 2 of letter Guaranty Life of Duncan, December 21st, 1934, attached as Ex. A to Bill of

Guaranty Life in suit 34029-E, treated as evidence in this cause by stipulation herein). Therefore, of the $11,000.00 of bonds on the defendant's financial statement, there were bonds having a value of only $4,300.00. . . .

"Notes Receivable, Accounts Receivable and Agents' balances appearing at approximately $10,000.00 on the statement are assumed by the master to have been worthless, except the $1192.31 owing by the Secretary S. A. Austin. The master is convinced of such worthlessness by the testimony of J. L. Lewis (p. 856, 862). The obligations of Austin, however, the master assumes were worth their face value. He was Secretary of the defendant company and went into the employ of Afro. He permitted his obligations to appear on the records of the company as an asset. Moreover, his testimony as to the nature and validity of his obligations is disputed by C. E. Curry.

"Furniture and fixtures appearing on the statement at $11,264.27, the master finds had a value of only $1,000.00. This is the value given furniture and fixtures in the agreement that was negotiated at Tallahassee (Schedule A, Afro Ex. 1). Moreover, in the letter from Guaranty Life dated December 21st, 1934, already referred to, this item was said to have only a nominal value. There is no other evidence of the value.

"Real estate appears on the statement of December 21, 1934, at $88,442.32. The master finds that the aggregate value of the real estate was only $37,000.00 . . . This real estate was reported on the annual report to the State Treasurer for 1933 at an aggregate value of $188,650.00—an exaggerated figure. Two of the intervenors testified as to the value of the 120 College Park lots (Parcels D and I, supra), but the master believes their opinion of value is too far out of line with the opinions of Register and Shelly to be given any weight. Intervenor's witness Nalle did not appraise these lots. Twenty-one of the College Park lots (Parcel I), Afro-American let go or surrendered for the mortgage, indicating they were not thought to be worth $57.00 each. . . .

"The 'debit' about which a good deal has been said may be compared to the good will of the business, or to the 'circulation' of a newspaper. It is the aggregate of weekly or

monthly premium receipts. The value of the 'debit' is often put at ten times the amount of the 'debit.' The defendant's 'debit' was about $1200.00 weekly. . . . Moreover, the value of the debit should not be taken into consideration in determining whether the company is insolvent. A going insurance concern cannot pay claims or expenses out of the value of its debit, any more than any going concern can pay expenses out of the value of its good will. The value of the debit can be turned into cash only when the company ceases to be a going concern.

"In this case, even if the liabilities had not exceeded the assets, the defendant company would still have been insolvent, because it had been for some time utterly unable to pay its liabilities and expenses as they matured in the regular course of business. Its credit was exhausted and practically everything of value it owned was in hock. . . .

"It is entirely possible that the assets could have been sold by the Court for a better price, although the master doubts it, and there is no evidence to prove it; but the Master is satisfied beyond any doubt that, conceding for the sake of argument the possibility that the price for which these assets have been sold was inadequate, there is no evidence of such inadequacy as would ordinarily justify the Court in ordering a resale. The primary duty of the State Treasurer and the Court in this proceeding was to protect the policy holders and creditors of the defendant corporation. Such rights had already been slighted or disregarded by the defendant, and they were in real jeopardy when the State Treasurer took over control. The policy holder and creditors have been completely protected by what has been done in this proceeding. . . .

"Finally, the master is of the opinion that the intervenors are barred by laches. There is evidence that at least one of the intervenors knew very soon after, that the transfers were made to Afro for only $1750.00 (Def. Ex. 3). Another consulted counsel in regard to the case (Kurz, 908; Anderson, 918). It is reasonable to suppose that other stockholders of defendant knew about the sale also; but, if they didn't they had means of learning about it. There was no concealment of the facts of the transaction; they were to be found in the

court file in this cause. The transfers were also recorded and reported in the news of recorded instruments (Int. Ex. G. & H.) and the notices were clipped from newspaper by intervenor Curry. The charge of laches cannot be avoided merely by claiming ignorance; a party must show that he had no reasonable opportunity of informing himself. Here, the intervenors waited five years or more before coming into court with their charges of collusion on the part of private parties and public officials and of improvidence on the part of the court. That delay is not explained or excused. During that time some of the people involved have died. . . . "

It is our conclusion that the evidence clearly established the insolvency of the Peoples Industrial Insurance Company at the time the Insurance Commissioner took it over, obtained the appointment of a liquidator and sold its assets after giving sufficient lawful notice to the complaining stockholders. We are unable to find in the record any support for the contention that the stockholders were without notice as to the financial difficulties of Peoples from September, 1934, continuously until the suit at bar was filed during August, 1940. We do not overlook the position of appellants' counsel with regard to the value placed upon the real estate holdings by the Special Master. It is our view that sufficient testimony appears in the record to support the conclusion reached. The $1751.00 ordered paid by the Court to the stockholders of Peoples must be considered in light of the statutory duty of the Insurance Commissiner to make and enter such orders with reference to insolvent life insurance companies as will fully protect the interest of the policy holders, its creditors and the public interest. It cannot be said on this record that W. V. Knott, former State Treasurer and Ex. Officio Insurance Commissioner, was derelict in his official duty nor has it been established that he was guilty of fraud on conspiracy to defraud the stockholders of Peoples.

Reversible error has not been made to appear and accordingly the decree of dismissal appealed from is hereby affirmed.

THOMAS, C. J., TERRELL, J., and PARKS, Associate Justice, concur.